IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM M. TAYLOR, | ) |
|       Plaintiff | ) Case No. 2:18-cv-1579 |
| v. | ) Magistrate Judge Patricia L. Dodge |
| SGT. CHESMER, | ) |
|       Defendant. | ) |

### MEMORANDUM[1]

For the reasons that follow, the Court will grant Defendant's Motion for Summary Judgment (ECF No. 60) as to all federal claims asserted against him, enter judgment in his favor and against Plaintiff on all federal claims, and dismiss Plaintiff's remaining state law claims without prejudice to bring in state court.

**I.   Relevant Procedural History**

Plaintiff, William M. Taylor, is a state inmate who is proceeding *pro se* in this civil rights action, which he brought pursuant to 42 U.S.C. § 1983. The events in question in this action occurred on February 9, 2018 when Plaintiff was housed at SCI Greene. He is currently housed at SCI Smithfield.

In Plaintiff's original complaint (ECF No. 8), he named as defendants the following four individuals who worked at SCI Greene: Sgt. Chesmer, Lt. Trout, Capt. Crumb, and Superintendent Robert Gilmore. He also named as a defendant John Wetzel, who is the Secretary of the Pennsylvania Department of Corrections ("DOC"). Defendants Wetzel, Gilmore, Trout,

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. Therefore, *Footnote continued on the next page...*

1

and Crumb filed a motion to dismiss for failure to state a claim against them for which relief can be granted. (ECF No. 26). Plaintiff did not oppose their motion, moved to dismiss them, and advised the Court that the only claims he wished to proceed with were those brought against Defendant Chesmer. (ECF No. 36). Accordingly, the Court dismissed Defendants Wetzel, Gilmore, Trout, and Crumb from this action. (ECF No. 37), leaving Defendant Chesmer as the the sole defendant in this case.

Following the close of discovery, the Court granted Plaintiff's motion for leave to file an Amended Complaint. (ECF No. 52). The Amended Complaint claims that Defendant Chesmer violated Plaintiff's Eighth Amendment rights on February 9, 2018, while Plaintiff was participating in a "program/group setting" and was handcuffed to a table. Specifically, the Amended Complaint alleges that Defendant Chesmer used excessive force against Plaintiff when he sprayed him twice in the face with OC spray without justification and because of the actions of "another inmate," who has been identified by the parties as Jerome Junior Washington. (ECF No. 52, ¶¶ 7, 11). The Amended Complaint further alleges that Defendant Chesmer was deliberately indifferent to Plaintiff's serious medical needs by leaving him in the affected area and cuffed to the table for approximately thirty-five minutes before taking him for medical treatment. (*Id.*, ¶¶ 7, 20-21). The Amended Complaint also brings related state law claims against Defendant Chesmer for assault and battery (*id.*, ¶¶ 25-28), defamation of character for filing a false disciplinary misconduct against Plaintiff following the incident (*id.*, ¶¶ 31-35), and intentional infliction of emotional distress (*id.*, ¶¶ 25-28). Plaintiff seeks monetary relief, a declaration that his Eighth Amendment rights were violated, and a permanent injunction

---

the undersigned has the authority to decide dispositive motions and enter final judgment.

directing the DOC to stop the use of "MK-9, OC spray" on mentally ill inmates.

Defendant Chesmer filed an Answer (ECF No. 53) to the Amended Complaint. He then filed the pending Motion for Summary Judgment (ECF No. 60) and supporting documents (ECF Nos. 61, 62).[2] Plaintiff filed his brief in opposition to summary judgment (ECF No. 66) and supporting documents (ECF No. 67, 68).

**II.     Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing the absence of a genuine, material dispute and an entitlement to judgment. *Id.* at 323. This showing does not necessarily require the moving party to disprove the opponent's claims. Instead, this burden may often be discharged simply by pointing out for the court an absence of evidence in support of the non-moving party's claims. *Id.*; *see, e.g., Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015).

---

[2] Jerome Junior Washington brought a lawsuit against several DOC defendants, including Defendant Chesmer, based upon the same incident at issue in this action. *See Washington v. Wetzel, et al.*, No. 2:18-cv-1209 (W.D. Pa.). In his Brief (ECF No. 61), Defendant Chesmer occasionally cites to documents filed by the DOC defendants in support of their motion for summary judgment in Washington's civil action. Those documents were not made part of the summary judgment record in this case and, therefore, the Court did not consider them in evaluating the motion for summary judgment in this case.

Once the moving party has met its initial burden, then the burden shifts to the non-moving party to demonstrate, by affidavit or other evidence, "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A non-moving party must "go beyond the pleadings" and show probative evidence creating a triable controversy. *Celotex*, 477 U.S. at 324. An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cnty Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. Cnty of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

Defendant Chesmer produced a DVD recording of the February 9, 2018 incident as an exhibit in support of his motion. Where the events at issue in a case have been captured on videotape, the court must consider the videotaped evidence in determining whether there is any genuine dispute as to material facts. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). The court must view the facts in the light depicted by the videotape. *Id.* (relying on a videotape in assessing summary judgment evidence and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape.").

Although courts must hold *pro se* pleadings to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), at the summary judgment stage a *pro se* plaintiff is not exempt from his burden of providing some affirmative

evidence, not just mere allegations, to show that there is a genuine dispute for trial. *See, e.g., Barnett v. NJ Transit Corp.*, 573 F. App'x 239, 243 (3d Cir. 2014) (holding that the *pro se* plaintiff was still "required to designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories…sufficient to convince a reasonable fact finder to find all the elements of her prima facie case") (citation and quotation omitted); *Siluk v. Beard*, 395 F. App'x 817, 820 (3d Cir. 2010) ("[T]he right of self-representation does not exempt a party from compliance with relevant rules of procedural law.").

### III.  Relevant Factual Background[3]

On February 9, 2018 at 12:40 p.m., Plaintiff, Washington, and several other inmates were in the day room located in the Secure Residential Treatment Unit, G Unit, B-pod. They were there for a therapeutic group session. Plaintiff was seated at a table with Washington and one other inmate ("Inmate No. 3"). They were each handcuffed and shackled to the table. (Def's Decl., ¶ 4; Pl's Aff., ¶¶ 6-7; Def's Ex. 3).

Defendant Chesmer is now retired. (Def's Decl., ¶ 1). When he worked at SCI Greene, his responsibilities included day-to-day management of the inmate population. (*Id.*, ¶ 2). According to Defendant Chesmer's version of events, he entered the day room on the date in question to return the inmates to their cells after they had completed their group session. (*Id.*, ¶ 4). He observed Washington and "other inmates" attempting to manipulate their handcuffs while standing at their table. (*Id.*, ¶ 5). Defendant Chesmer ordered the inmates to sit down and prepare to be escorted individually back to their cells. (*Id.*, ¶ 6). At that point, the situation escalated and

---

[3] The factual background is taken from Defendant Chesmer's concise statement of materials facts (ECF No. 63) and Plaintiff's response (ECF No. 68), as well as the exhibits cited in those documents, including the DVD recording of the incident, Defendant Chesmer's declaration (ECF *Footnote continued on the next page…*

Defendant Chesmer observed Washington attempt to forcefully remove his restraints in order to free himself and assault him. (*Id.*, ¶ 7). Defendant Chesmer applied OC spray in Washington's direction after Washington attempted to spit on him. (*Id.*, ¶ 8). Defendant Chesmer then ordered Washington to take his seat again, but instead of complying with that directive Washington removed his penis from his pants in an attempt to urinate on Defendant Chesmer. (*Id.*, ¶ 9). At that point, Defendant Chesmer sprayed OC again in order to gain compliance from Washington. (*Id.*, ¶ 10). Defendant Chesmer maintains that at no time did he aim the canister or administer OC spray at Plaintiff. (*Id.*, ¶ 12). However, given the close proximity of Plaintiff to Washington, Defendant Chesmer acknowledges that Plaintiff was exposed to OC spray. (*Id.*, ¶ 11).

According to Plaintiff's version of events, when the inmates were in the day room someone using the intercom system provoked Washington by calling him a "rapist" and the other inmates his "rapist lovers." (Pl's Aff., ¶ 10). Moments later, Defendant Chesmer and three of his officers entered the day room. Defendant Chesmer was holding in his hand a MK-9 canister of OC spray with the safety pin already removed, and he and the officers approached Plaintiff, Washington, and Inmate No. 3's table. (*Id.*, ¶¶ 11, 13). Washington told the officers to "stay off the intercom[,]" and Defendant Chesmer replied that Washington was "tough when [his] rapist lovers are around." (*Id.*, ¶ 13). Washington stood up and started screaming and, according to Plaintiff, Defendant Chesmer "started firing the MK-9 can of OC spray at" Plaintiff, Washington, and Inmate No. 3. (*Id.* at 14).

Plaintiff states that Defendant Chesmer continued to taunt Washington as he was walking away, which "provoked" Washington to "respond." (*Id.*, ¶ 15). At that point, Plaintiff maintains,

---

No. 62-2), and Plaintiff's affidavit (ECF No. 67).

Defendant Chesmer "turned back around and emptied the remainder of the MK-9 can of OC spray on me [Plaintiff]." (*Id.*) He avers that "[a]fter being sprayed (twice) I was made to sit in the contaminated area, hardly able to breathe" for approximately "40 minutes to an hour covered in OC spray, with my eyes and skin burning in unbearable pain." (*Id.*, ¶ 19). After Plaintiff was removed from the day room, he was escorted to the medical room where staff cleaned his eyes. (*Id.*, ¶ 20).

The video of incident, which does not contain sound, depicts the following relevant events:

| | |
|---|---|
| 12:41:00 | Seven inmates are observed at various tables in the day room. Four inmates are sitting alone at four separate tables. Plaintiff, Washington, and Inmate No. 3 are at a table in the middle of the room. All of the inmates are secured to their tables by hands and leg restraints. Plaintiff, who is to the left of Washington at their table, is standing. Inmate No. 3, who is to the right of Washington at the table, is standing with his back facing the camera before turning to sit on top of the table. Washington is sitting at the table and it is unclear what, if anything, he is doing with his hands. The hands of the other inmates in the room are not visible or clear on the video. |
| 12:43:48 | Defendant Chesmer and four other guards appear on screen in the day room. Defendant Chesmer is holding the canister of OC spray in his right hand. He approaches the table with Plaintiff, Washington, and Inmate No. 3, and he and one of the other guards begins to speak with Inmate No. 3. Another guard speaks with Plaintiff. Washington is sitting at the table but is not directly addressed by any of the guards who are present, although he does appear to be listening to what is being said between Defendant Chesmer and Inmate No. 3. |
| 12:44:23 | Washington, who is still sitting at the table, appears to say something to Defendant Chesmer and the other guard speaking to Inmate No. 3. A conversation then appears to ensue between Washington and Defendant Chesmer. |
| 12:44:37-44 | While speaking to Defendant Chesmer, Washington gets agitated and stands up from his seat at the table. He then very quickly pulls at each of his wrist restraints. Washington makes what appears to be a quick pelvic thrust move while he is speaking with Defendant Chesmer. |

7

| | |
|---|---|
| 12:44:45-46 | Defendant Chesmer deploys OC spray to Washington's face. It appears that he is standing approximately five to six feet away from Washington when does so. Plaintiff appears to be standing about two to three feet from, and to the left of, Washington at the time, and when Washington is sprayed in the face Plaintiff turns away and hunches over. |
| 12:44:47 | Defendant Chesmer stops the deployment of the OC spray. |
| 12:44:49 | Agitated, Washington takes the papers that are on the table in front of him and throws them towards Defendant Chesmer and the other guards. |
| 12:44:52 | Washington tries to pull himself away from the table and appears to try and kick Defendant Chesmer, who is out of reach. Some of the guards begin to leave the day room and/or the view of the camera. |
| 12:44:59 | When facing Defendant Chesmer, Washington reaches into his pants and pulls his penis from his pants. |
| 12:45:02 | Defendant Chesmer, who appears to be standing approximately six to eight feet away from Washington at this time, again deploys OC spray towards Washington's face. At this point, Plaintiff is seated at the table approximately four to five feet behind and slightly to the left of Washington and, as a result, he is exposed to the spray again. He is hunched over, turned slightly away from the spray, and he is covering his mouth with his hands. |
| 12:47:15 | Guards wearing masks enter the day room and start removing inmates from the tables and returning them to their cells. Plaintiff and Washington are the final two inmates who are removed from the day room. |
| 13:24:00 | Three guards remove Plaintiff from the table and out of the day room. Therefore, Plaintiff remained in the day room for approximately 40 minutes after Defendant Chesmer first deployed the OC spray. |

After Plaintiff was removed from the day room, he was escorted to the medical unit where staff cleaned his eyes. (Pl's Aff., ¶ 20). The same day, Defendant Chesmer issued a misconduct report against Plaintiff, charging him with (1) unauthorized group activity and (2) refusing to obey an order. (Pl's Ex. A, ECF No. 67-1 at p. 1). As a result, Plaintiff was subjected to several restrictions, including a shower restriction. (Pl's Ex. 2, ECF No. 52-2 at

p. 1). In his affidavit, Plaintiff avers that he was "left (body contaminated) in these torturous living conditions for 6-7 days suffering in pain due to [his] skin constantly burning, which also resulted in los[s] of sleep for nearly a week and other mental and emotional pain." (*Id.*, ¶ 20). However, in his original complaint, which he verified, he averred that the nurse cleaned his eyes out immediately after the incident, gave him clean clothes, and he was permitted to take a shower three days after the incident. (ECF No. 8, ¶ 8).

Plaintiff filed Grievance 720864 following the incident. (ECF No. 63, ¶ 1; ECF No. 68, ¶ 1; Def's Ex. 1, ECF No. 62-1 at pp. 8-9). He asserted that Defendant Chesmer used excessive force and he complained about how long he was kept in the day room after the incident. He also stated that after his eyes were cleaned out by medical staff, he was placed back in his cell while his skin was still burning from the OC spray. (*Id.*) Importantly, Plaintiff did not request any relief, including monetary relief, in his initial grievance. (ECF No. 63, ¶ 2; ECF No. 68, ¶ 2).

Plaintiff's misconduct hearing was held six days after the incident, on February 15, 2018. The hearing examiner, who reviewed the videotape of the incident, concluded that there was insufficient evidence to support the charges of unauthorized group activity and refusing to obey an order and dismissed those charges. (Pl's Ex. B, ECF No. 67-2 at p. 1).

A RHU Lieutenant denied Grievance 720864 on February 28, 2018. (Def's Ex. 1, ECF No. 62-1 at pp. 6-7). He stated that his investigation indicated Plaintiff and two other inmates caused a disturbance during the group therapy session, that the OC spray was deployed because of Washington's actions, and that after Defendant Chesmer deployed the OC spray "[t]he ventilation system was turned on as well as yard doors opened to clear the pod of O/C." (*Id.* at p. 6). The Lieutenant further noted that once Plaintiff was removed from the day room he was taken

"to triage to be assessed and then placed in a strip cage. You cooperated with a strip search and were issued clean clothing and escorted back to your cell. You then had an opportunity to wash in your cell for any remaining effects of O/C." (*Id.*)

In his appeal of the denial of Grievance 720864, Plaintiff pointed out that the hearing examiner who had presided over his misconduct hearing had dismissed the charges against him. Plaintiff maintained that this supported his contention that Defendant Chesmer's use of force was not justified and that he had fabricated the reasons for deploying the OC spray. Plaintiff also requested monetary relief for the first time. (*Id.* at pp. 3-5). Superintendent Gilmore denied Plaintiff's appeal (*id.* at p. 3) and the Chief Grievance Coordinator subsequently upheld his response. (*Id.* at p. 1). She noted that Plaintiff requested no type of relief in his initial grievance. She also explained to Plaintiff that "[a]ny issues raised in your appeal to final review that were not raised in your initial grievance, including requested relief, will not be addressed at this level." (*Id.*)

IV. **Discussion**

    A. <u>Plaintiff Failed to Exhaust His Claims for Monetary Relief</u>

Defendant Chesmer argues that he is entitled to summary judgment on Plaintiff's Eighth Amendment claims because he failed to exhaust his claims for monetary relief.[4] Exhaustion is a "non-jurisdictional prerequisite to an inmate bringing suit" and when raised by a defendant it constitutes a threshold issue to be addressed by the court. *See, e.g., Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018).

The Prison Litigation Reform Act ("PLRA") mandates that an inmate exhaust "such

---

[4] Because the Court agrees that Plaintiff failed to exhaust his available administrative remedies with respect to his Eighth Amendment claims, the Court need not address the alternative *Footnote continued on the next page...*

10

administrative remedies as are available" before bringing a suit challenging prison conditions. 42 U.S.C. § 1997e(a). The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The Supreme Court has repeatedly observed that the PLRA's exhaustion requirement "is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) and *Jones v. Bock*, 549 U.S. 199, 211 (2007)). Exhaustion is mandatory under the PLRA regardless of the type of relief sought and the type of relief available through administrative procedures. *Booth v. Churner*, 532 U.S. 731, 741 (2001). Courts are not given discretion to decide whether exhaustion should be excused, *Ross*, 136 S.Ct. at 1858, and there is no exception to the exhaustion requirement based on "futility." *Ahmed v. Dragovich*, 297 F.3d 201, 206 (3d Cir. 2002) (citations omitted).

The PLRA's mandatory exhaustion requirement means not only that a complaint filed before administrative remedies are exhausted is premature and cannot be entertained, it also means that failure to exhaust administrative remedies in accordance with a prison's grievance procedures constitutes procedural default. *Woodford*, 548 U.S. at 93-95; *see also Spruill v. Gillis*, 372 F.3d 218, 227-30 (3d Cir. 2004). That is because "the PLRA's exhaustion requirement requires proper exhaustion." *Woodford*, 548 U.S. at 93; *Spruill*, 372 F.3d. at 227-30.

---

arguments asserted by Defendant Chesmer in support of summary judgment in his favor.

The Court of Appeals has explained that if the defendant demonstrates the inmate failed to exhaust his administrative remedies, then "the inmate plaintiff bears the onus of producing evidence that the on-the-books remedies were in fact unavailable to him or her." *West v. Emig*, 787 F. App'x 812, 814 (3d Cir. 2019) (citing *Rinaldi*, 904 F.3d at 268). "If there is no genuine dispute of material fact, then the exhaustion defense may be evaluated as a matter of law at summary judgment." *Id.*

The prison's grievance policy is what "define[s] the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218; *Spruill*, 372 F.3d at 230-31 (the "prison grievance procedures supply the yardstick for measuring procedural default."). Therefore, the procedural requirements for exhaustion in a given case "are drawn from the polices of the prison in question rather than from any free-standing federal law." *Shifflett v. Korszniak*, 934 F.3d 356, 364 (3d Cir. 2019) (citing *Spruill*, 372 F.3d at 231).

The DOC has an official Inmate Grievance System that governs the grievance and appeals process in Pennsylvania correctional institutions. *See* 37 Pa. Code § 93.9. The Inmate Grievance System is set forth in DC-ADM 804[5] and "is intended to deal with a wide range of issues, procedures, or events that may be of concern to an inmate." DC-ADM 804, Inmate Grievance System Procedures Manual § 1(A)(2). It is not meant to address "[i]ssues concerning a specific inmate misconduct charge, conduct of hearing, statements written within a misconduct and/or other report, a specific disciplinary sanction, and/or the reasons for placement in administrative custody[,]" which must be addressed through DC-ADM 801, Inmate Discipline and/or DC-ADM 802, Administrative Custody Procedures. *Id.* at § 1(A)(7).

---

[5]The policy is posted on the DOC website and is accessible at: https://www.cor.pa.gov/About%2
*Footnote continued on the next page…*

DC-ADM 804 sets forth a three-tier administrative remedy system. A prisoner is required to present his grievance to the Facility Grievance Coordinator for initial review. *Id.* at § 1(C). The prisoner is required to appeal an adverse determination by the Facility Grievance Coordinator to the Facility Manager. *Id.* at § 2(A). From there the prisoner must appeal to the Secretary's Office of Inmate Grievances and Appeals for appeal to final review. *Id.* at § 2(B).

In this case, "[t]he level of detail necessary in a grievance to comply with the grievance procedures[,]" *Jones*, 549 U.S. at 218, is established by § 1(A)(11) of DC-ADM 804. It requires:

> The text of the grievance must be legible, understandable, and presented in a courteous manner. The inmate must include a statement of the facts relevant to the claim.
>
> a. The statement of facts shall include the date, approximate time, and location of the event(s) that gave rise to the grievance.
>
> b. The inmate shall identify individuals directly involved in the event(s).
>
> c. The inmate shall specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law.
>
> d. *If the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance.*

(Emphasis added).

As set forth above, Defendant Chesmer has the initial burden of demonstrating that Plaintiff failed to resort to the available administrative remedies. *See, e.g., Rinaldi*, 904 F.3d at 268. He has satisfied his burden. There is no dispute that Plaintiff failed to seek monetary relief

---

0Us/Pages/DOC-Policies.aspx.

in his initial grievance. Courts within the Third Circuit have held that in light of the mandatory nature of the language set forth above at DC-ADM 804 § 1(A)(11)(d) regarding the requesting of "compensation or other legal relief normally available from a court," an inmate procedurally defaults any claim for monetary relief if he did not seek such relief in his grievance. *See, e.g., Wright v. Sauers*, 729 F. App'x 225, 227 (3d Cir. 2018) (affirming the district court's grant of summary judgment for defendant on plaintiff's excessive force claim because plaintiff failed to request monetary relief in his initial grievance) (citing *Spruill*, 372 F.3d at 233-35);[6] *Cunningham v. Zubsic*, No. 1:16-cv-127, 2019 WL 134209, *5 (W.D. Pa. Jan. 8, 2019) (plaintiff's request for monetary relief barred because he did not request that relief in his grievance); *Camacho v. Beers*, No. 2:16-cv-1644, 2018 WL 6618410, *3 (W.D. Pa. Dec. 18, 2018) (holding that, because "Plaintiff failed to request the specific relief of monetary compensation in the grievances he filed as to the subjects of this lawsuit...he did not exhaust all administrative remedies with regard to such claims...[and] may not pursue an action in federal court based on the claims raised in his procedurally defective grievances."); *Sanders v. Beard*, 3:09-cv-1384, 2013 WL 1703582, *6 (M.D. Pa. Apr 19, 2013) (dismissing claims for monetary damages brought by plaintiffs who did not request monetary damages in their initial grievances as required by DC-ADM 804). As the district court in *Wright* explained:

---

[6] The Court of Appeals in *Wright* explained that in *Spruill* it had "rejected a procedural default claim based on an inmate's failure to specifically request monetary relief on a prior version of DC-ADM 804" that did not *require* an inmate to seek such relief in a grievance. *Wright*, 729 F. App'x at 227. It further explained that "[c]rucially...we also observed that—to the extent [the Prison] was dissatisfied with our ruling—the Prison could 'alter the grievance system to require more (or less) of inmates by way of exhaustion.'" *Id.* (quoting *Spruill*, 372 F.3d at 235). "Subsequently, the Prison amended its policy to include the mandatory language deemed lacking in *Spruill*." *Id.*

> a requirement to set forth the compensation or legal relief requested places the agency on notice of the prisoner's demand or valuation of his or her claim, and furthers the PLRA's underlying litigation avoidance goals by supporting early settlement or accommodation. Proper exhaustion, including adherence to a requirement to delineate the relief requested, therefore promotes the efficiency recognized in *Woodford*, permitting claims to be "resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Woodford* at 87, 126 S.Ct. 2378. Given the underlying goals of the PLRA, and the state of the law requiring adherence to clearly stated content requirements, this Court must conclude that the mandatory nature of the language at issue gives rise to procedural default as a result of Plaintiff's failure to set forth the desired monetary or other legal relief on his initial grievance form.

*Wright v. Sauers*, No. 13-cv-358, 2017 WL 3731957, 7-8 (W.D. Pa. Aug. 30, 2017), affirmed, 729 F. App'x 225 (3d Cir. 2018).

Since Defendant Chesmer has satisfied his burden, the burden now shifts to Plaintiff to demonstrate that the administrative remedies were in fact unavailable to him for his Eighth Amendment claims. *See, e.g., Rinaldi*, 904 F.3d at 268. The Supreme Court explained in *Ross* that the term "available" means "capable of use" to obtain "some relief for the action complained of." 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)).

> [It] identified "three kinds of circumstances in which an administrative remedy, although officially on the books," is not "available" because it is "not capable of use to obtain relief": (1) when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use," such as when no ordinary prisoner can discern or navigate it; or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Rinaldi*, 904 F.3d at 266-67 (quoting *Ross*, 135 S. Ct. at 1859-60). *See also Hardy v. Shaikh*, 959 F.3d 578, 584 (3d Cir. 2020) (misleading or deceptive instructions from a prison official, as well as clearly erroneous statements, can render a grievance process unavailable). The Court of Appeals has further held "that as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies

unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement." *Shifflett*, 934 F.3d at 365.

Plaintiff has not satisfied his burden of proving that any of the above-cited circumstances were present in order to make administrative remedies unavailable for Eighth Amendment claims. He argues that monetary relief was not available to him at the time he filed his initial grievance because the hearing examiner had not yet issued the decision to dismiss the misconduct charges against him. This argument has no merit. The DOC grievance policy did not require that his misconduct charges be dismissed before he could grieve his Eighth Amendment claims or seek monetary relief on them. Additionally, Plaintiff knew when he filed his grievance that he had sustained an injury as a result of the alleged Eighth Amendment violations and, therefore, at that time he possessed the requisite information to request monetary relief for that injury. *See, e.g., Wright*, 729 F. App'x at 227 n.12 (rejecting plaintiff's argument that the grievance process was "unavailable" to him because he was unaware of the severity of his injury when he filed his grievance; concluding that "[a]lough [plaintiff] may not have known the extent of his injury" when he filed his grievance, "he knew he suffered *an injury*.") (emphasis in original). Moreover, DC-ADM 804 § 1(A)(11)(d) clearly instructs that an inmate is required to request the specific relief he seeks in his initial grievance and Plaintiff has produced no evidence that any prison official gave him contrary or misleading instructions in that regard prior to the filing of his initial grievance.

Based upon the foregoing, Plaintiff did not exhaust his available administrative remedies with respect to his request for monetary relief on his Eighth Amendment claims and there is no basis to conclude that administrative remedies were not available to him when he filed his initial

16

grievance. Therefore, Plaintiff is barred from seeking monetary relief on those claims and Defendant Chesmer is entitled to judgment in his favor on them for that reason.

Additionally, for the reason that follow, Plaintiff cannot proceed with claims for prospective relief against Defendant Chesmer, who is now retired, in his official capacity. Therefore, Plaintiff has no viable remaining Eighth Amendment claims against Defendant Chesmer.

    B.    <u>Claims Against Defendant Chesmer In His Official Capacity and For Prospective Relief</u>

Defendant Chesmer is also entitled to summary judgment in his favor to the extent that Plaintiff sued him in his official capacity and for prospective relief. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted). In this case, Defendant Chesmer was an employee of the DOC, and, therefore, a suit against him in his official capacity is really a suit against the DOC and is no different from a suit against the Commonwealth of Pennsylvania.

The Eleventh Amendment provides states with immunity not only from suits brought by citizens of other states, but also from suits brought by their own citizens. *Hans v. Louisiana*, 134 U.S. 1, 12-14 (1890). However, a state's Eleventh Amendment protection from federal suits is not absolute. Congress may authorize such a suit under its power to enforce the Fourteenth Amendment, *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999), thereby abrogating a state's sovereign immunity, but only "when it both unequivocally intends to do so and 'acts pursuant to a valid grant of constitutional authority,'"

*Bd. of Trs. Of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (quoting *Kimel v. Bd. of Regents*, 528 U.S. 62, 73 (2000). A state may also waive its sovereign immunity by consenting to suit. *Coll. Sav. Bank*, 527 U.S. at 670 (citing *Clark v. Barnard*, 108 U.S. 436 (1883)); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985). Additionally, a person seeking purely prospective relief against state officials for ongoing violations of federal law may sue under the "legal fiction" of *Ex parte Young*, 209 U.S. 123, 159-60 (1908), despite the text of the Eleventh Amendment. *Alden v. Maine*, 527 U.S. 706, 757 (1999).

By statute, the Commonwealth of Pennsylvania has specifically withheld its consent to be sued. 42 Pa. C.S.A. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."); *see also Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981). Additionally, Congress has not expressly abrogated Pennsylvania's Eleventh Amendment immunity from civil rights suits for damages. *See, e.g., Will*, 491 U.S. at 66 ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."); *Quern v. Jordan*, 440 U.S. 332, 341 (1979); *Boykin v. Bloomsburg Univ. of Pa.*, 893 F. Supp. 378 (M.D. Pa. 1995) (holding that States' immunity has not been abrogated for actions brought under §§ 1981, 1983, 1985, and 1986), aff'd, 91 F.3d 122 (3d Cir. 1996). Therefore, Plaintiff is barred from seeking money damages against Defendant Chesmer in his official capacity. And, as the Court has already held, he failed to exhaust his claims for money damages.

Plaintiff is also seeking prospective relief against Defendant Chesmer. As an initial

matter, the Court notes that Plaintiff failed to put forth any evidence that, when he was employed by the DOC as a correctional officer, Defendant Chesmer had the authority to establish, enforce, or alter DOC policy to prohibit the use of OC spray on mentally ill inmates, which is the injunctive relief Plaintiff seeks in this action. Since Defendant Chesmer is now retired, he certainly does not have that authority to do so now. Therefore, an injunction directed to Defendant Chesmer would be inappropriate and could not bind anyone who might have the authority to end any alleged constitutional violation if so ordered. *See Parkell v. Danbert*, 833 F.3d 313, 332 (3d Cir. 2016) ("In seeking a prospective injunction against the implementation of an unconstitutional state policy, [the plaintiff] is required to name [as a defendant] an official or officials who can appropriately respond to injunctive relief.") (internal citations and quotations omitted).

In any event, to plead a cause of action under *Ex parte Young*, a plaintiff must establish a present violation of federal law. *See, e.g., B.H. Papasan v. Allain*, 478 U.S. 265, 278 (1986) (*Ex parte Young* applies to those cases in which a violation of federal law is ongoing, not to those in which federal law was violated in the past); *Milliken v. Bradley*, 433 U.S. 267, 289-90 (1977) (*Ex parte Young* applied to defendants perpetuating a system of de jure segregation at the time the suit was filed). In this case, the alleged violation of Plaintiff's Eighth Amendment rights is not ongoing, and, consequently *Ex parte Young* is inapplicable.

Based upon the foregoing, Defendant Chesmer is entitled to summary judgment to the extent Plaintiff has sued him in his official capacity and for prospective relief.

C.     Plaintiff's State Law Claims

Defendant Chesmer argues that if the Court grants him summary judgment on his Eighth

Amendment claims, it should decline to exercise jurisdiction over his pending state law claims. Where, as is the case here, all claims over which the Court has original jurisdiction have been dismissed, the district court may decline to exercise supplemental jurisdiction over remaining state law claims. 28 U.S.C. § 1367(c)(3). Although declining to exercise jurisdiction is within the discretion of the district court, the Court of Appeals has held that, absent extraordinary circumstances, pendent jurisdiction should be declined where the federal claims are no longer viable. *Shaffer v. Bd. of Sch. Dir. Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984) (citations omitted).

In this case, Plaintiff's federal claims are no longer viable and no extraordinary circumstances warrant the exercise of supplemental jurisdiction over Plaintiff's state law claims. Accordingly, the Court will dismiss Plaintiff's state law claims without prejudice. *See, e.g., Camacho*, No. 2:16-cv-1644, 2018 WL 6618410 at *3 (citing *Probst v. SCI Greene Med. Dept.*, No. 2:17-cv-1014, 2018 WL 2012892, *3 (W.D. Pa. Apr. 30, 2018).

## V.   Conclusion

Based upon the foregoing, the Court will grant Defendant's Motion for Summary Judgment (ECF No. 60) as to all federal claims asserted against him, enter judgment in his favor and against Plaintiff on all federal claims, and dismiss Plaintiff's remaining state law claims without prejudice to bring in state court.

BY THE COURT:

Dated: September 8, 2020

PATRICIA L. DODGE
United States Magistrate Judge